**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**ST. THOMAS/ST. JOHN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 3:25-75 |
| | : | |
| NIGEL COOPER | : | |

## MEMORANDUM

**KEARNEY, J.**                                                              **June 5, 2026**

A Tortola man lawfully entered St. John with his British Virgin Islands passport including specific permission to enter the United States as a tourist. He arrived on the ferry with a backpack to run errands for his wife and return the same day.  He cleared the first level of customs with his British Virgin Islands passport.  An alert required customs officers to perform a secondary search of his backpack and belongings. The officers found nothing illegal in his backpack. But they found an identification card in the sleeve of his wallet entitled "Permanent Resident Card." They double checked the information on this Card and confirmed false information.

Congress criminalized the possession of a false "alien registration receipt card" renamed as a "permanent resident card" over twenty-five years ago.  The United States decided to prosecute this Tortola man for having a false identification document in his wallet even though he legally entered St. John. We proceeded to trial. He moved for acquittal after the close of the United States' case leading to extended oral argument. We found sufficient evidence for the jury. The jury later found him guilty of knowingly possessing a fraudulent alien registration receipt card in his wallet. The Tortola man now moves for acquittal repeating the same arguments made during trial. He also summarily seeks a new trial with no supporting arguments. We understand the disconnect; he lawfully entered St. John with valid documents. But the jury also found he knowingly possessed a fraudulent permanent resident card once known as an alien registration receipt card based on

substantial evidence of fraudulent statements on the Card. The question became whether the Tortola man knew he possessed a fraudulent United States immigration document in addition to his legal British Virgin Islands passport. And the United States chose to prosecute and adduced sufficient evidence of a federal crime. The jury found the United States proved he knew of the fraudulent nature of the Card in his wallet on this October daytrip. We again studied the record and the adduced testimony.  We find no basis to overturn the jury's verdict and deny the Tortola man's motions for acquittal and new trial.

## I.     Evidence adduced at trial

The jury evaluated evidence concerning Tortola citizen Nigel Cooper's October 30, 2025 arrival in St. John from Tortola, his referral to secondary inspection, the officers' discovery of a permanent resident card in his wallet, and testimony concerning whether an identification card found in his wallet appeared genuine and belonged to him. The jury also heard substantial circumstantial evidence as to Mr. Cooper's knowing the fraudulent nature of the card in his wallet on October 30, 2025.

***Customs and Border Protection officers inspect Mr. Cooper's backpack and wallet.***

Nigel Cooper travelled on a ferry from his Tortola, British Virgin Islands home to St. John on a one-day October 30, 2025 trip with a black backpack to buy items for his wife at PriceSmart and return home to Tortola.[1] Mr. Cooper approached Customs and Border Protection Officer Crystal Charles-Pilgrim for inspection upon arriving on St. John.[2] Mr. Cooper presented his British Virgin Islands passport with a green certificate waiver, which Officer Charles-Pilgrim described as permitting British Virgin Islanders with the required passport notation to enter the United States with visitor status.[3] Officer Charles-Pilgrim understood Mr. Cooper to travel as a tourist for pleasure and she found his passport and waiver valid during her initial review.[4]

Officer Charles-Pilgrim then swore an alert appeared on his record directing further checks after she entered Mr. Cooper's information into the computer system and she then took him to secondary inspection.[5] Officer Charles-Pilgrim asked Mr. Cooper "binding declaration" questions in secondary inspection and directed him to empty his pockets before she examined his belongings.[6] Officer Charles-Pilgrim searched his black backpack while he stood near her.[7] Officer Charles-Pilgrim swore Mr. Cooper asked why "did [she] have to do all this" and she told him Customs and Border Protection could inspect baggage entering the customs territory.[8] She swore Mr. Cooper cooperated as she searched his backpack.[9] Officer Charles-Pilgrim swore she then saw Mr. Cooper pick up his wallet and begin looking through cards while she looked through his backpack.[10] She swore she told Mr. Cooper to put down the wallet and step back and he complied.[11] Officer Charles-Pilgrim found paperwork in the backpack, including "timecards for two different places for work in the United States," an airline ticket bearing Mr. Cooper's name and reflecting travel from St. Thomas to Atlanta, a Kansas City, Missouri receipt dated June 22, 2025, and a Western Union receipt identifying Mr. Cooper and an address in Branson, Missouri.[12]

### *The customs officers find a permanent resident card in Mr. Cooper's wallet.*

Officer Charles-Pilgrim then searched Mr. Cooper's wallet and found a card in "a plastic sleeve that looked like a lawful [p]ermanent [r]esident [c]ard."[13] She swore there were other credit and identification cards in the wallet and the Card "was lodged into . . . the sleeve part."[14] She explained "[a] lawful [p]ermanent [r]esident [c]ard is a [g]reen [c]ard allowing a person to live and work in the United States."[15] She swore she saw "hundreds" of these cards through her work and believed the Card in Mr. Cooper's wallet did not look like an original card because the color looked different from cards she saw during primary inspections.[16] Officer Charles-Pilgrim asked Mr. Cooper where he received the Card and what it was and "he told [her] it was an ID card."[17] Her

3

"primary system" checks did not show Mr. Cooper had a lawful Card.[18] Officer Charles-Pilgrim also found a Social Security card bearing Mr. Cooper's name but could not determine the lawfulness or validity of the Social Security card.[19]

Officer Charles-Pilgrim called fellow Officer Troy Williams to look at what she had found because it is Customs and Border Protection practice for another officer to witness a secondary inspection.[20] She also contacted her supervisor and then began an expedited-removal event case while other officers helped search the Card number and the Social Security number.[21] Officer Charles-Pilgrim then conducted a "question and answer" interview with Mr. Cooper.[22] She swore she asked Mr. Cooper where he received the Card and he said he had nothing to tell her.[23] Officer Charles-Pilgrim recalled Mr. Cooper "seemed nervous" and swore "he said he got [the Card] from someone where he had been staying in Missouri," [i]n a shop or a store," and paid for it.[24] She swore Mr. Cooper described the person who gave him the Card as a "red skin dude."[25] Officer Charles-Pilgrim swore Mr. Cooper told her "he needed an [identification] card at the time that ha[d] an address on it and the [C]ard that he was given did not have an address, so it wouldn't do anything for him. So he just left the [C]ard alone in his wallet."[26]

Officer Williams confirmed Officer Charles-Pilgrim called him for help after she held up the Card found in Mr. Cooper's wallet and described it as "fake."[27] Officer Williams escorted Mr. Cooper to a more secure area, conducted a pat-down with another officer for officer safety, and found no weapons or contraband.[28] Officer Williams swore Mr. Cooper told him "while he was in Illinois" or "one of the states in the continental [United States], he was asking around for an [identification card]" and "someone told him to go to a specific place to get an [identification card] and then he went to that place and he spent a hundred dollars to get" the Card.[29] Officer Williams saw the Card, observed Mr. Cooper's name and place of birth on it, and swore it did not look like

4

an original card based on his experience.[30] Officer Williams then queried the "[alien registration]-number" on the Card and the system returned information for a different person.[31] He also found no "[alien register]-number" issued to Mr. Cooper.[32] Officer Williams swore Mr. Cooper described going to a "shop or store," speaking with a "red skin guy," taking a photo, leaving, and later receiving an envelope containing the Card and Social Security card.[33] He swore Mr. Cooper "was basically saying he don't know how he got there and he just took the envelope from the person."[34]

Officer Sheldon Brooks also assisted after Officer Charles-Pilgrim called him.[35] Officer Brooks conducted an "officer safety pat-down" and looked for additional documents after officers found the Card.[36] Officer Brooks performed system checks on the Card to verify whether the information on the Card matched Custom and Border Protection records.[37] Officer Brooks used the "[alien registration]-number" from the Card in Mr. Cooper's wallet to run a check and swore the number returned to a different person and a search using Mr. Cooper's information did not return an "[alien registration]-number" or a lawful Card for him.[38] Officer Brooks relayed the information to a supervisor who directed him to contact Homeland Security Investigations.[39]

### *Evidence regarding the Card number in the wallet and authenticity.*

United States Citizenship and Immigration Services Field Office Director Jody Luntsford explained United States Citizenship and Immigration Services processes applications for immigration benefits, including lawful permanent residence.[40] Director Luntsford swore an applicant for lawful permanent residence requires the petitioner file an application, pay a fee of approximately $2,000, and attend an interview at a field office after the application is processed.[41] She explained the applicant must provide biographical information, address admissibility questions, and submit supporting documents.[42] Director Luntsford also swore United States Citizenship and Immigration Services issues permanent resident cards to individuals with lawful

permanent residence status and each card contains an "alien registration-number" unique to one person.[43] She also swore United States Citizenship and Immigration Services maintains all records relating to permanent residence applications and immigration status.[44] Director Luntsford ran the "alien registration-number" from the Card in Mr. Cooper's wallet through United States Citizenship and Immigration Services systems and found the number belonged to a female Chinese woman.[45] She did not run a separate system check to determine whether Mr. Cooper ever applied for United States Citizenship and Immigration Services benefits.[46]

The United States also adduced an expert opinion from Hillary Hoover, a forensic document examiner from the Homeland Security Investigations Forensic Laboratory.[47] Ms. Hoover swore the laboratory received the Card from Mr. Cooper's wallet from a Homeland Security Investigations special agent for examination.[48] Ms. Hoover compared the Card to a genuine standard and concluded the Card was fake.[49]

The jury found Mr. Cooper guilty of possessing a fraudulent immigration document beyond a reasonable doubt.

## II.    Analysis

Mr. Cooper moves for acquittal or a new trial.[50] He challenges the sufficiency of the evidence supporting his conviction for possession of a fraudulent immigration document. Mr. Cooper argues the United States did not prove beyond a reasonable doubt the Card found in his wallet qualified as the charged alien registration card or alien registration receipt card because the Card bore the words "Permanent Resident Card" and no witness expressly testified the terms refer to the same document.[51] He also argues the United States failed to prove he knowingly possessed the Card or knew it was fraudulent.[52] He alternatively seeks a new trial based on the same asserted evidentiary deficiencies.[53]

Our Court of Appeals instructs us to examine the "totality of the evidence, both direct and

circumstantial, and interpret the evidence in the light most favorable to the [United States] as the verdict winner" in a sufficiency-of-the-evidence claim under Rule 29.[54] "The jury's verdict shall be upheld when 'substantial evidence from which a rational trier of fact could find the essential[] elements of the crime beyond a reasonable doubt.'"[55] "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high."[56] We "do not weigh evidence or determine the credibility of witnesses in making [our] determination[]" on a Rule 29 motion for acquittal.[57]

Our colleagues counsel we may grant a new trial under Rule 33 to cure errors in jury instruction "of sufficient magnitude."[58] "[E]ven if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'"[59] But our Court of Appeals disfavors Rule 33(a) motions and instructs they "should be 'granted sparingly and only in exceptional cases.'"[60] In evaluating a Rule 33 motion, we "do[] not view the evidence favorably to the [United States], but instead exercise[] [our] own judgment in assessing the [the United States'] case."[61]

We deny Mr. Cooper's Motion. The Supreme Court through Rule 29 does not allow us to reweigh the evidence or second-guess the jury's credibility determinations. Viewed in the light most favorable to the United States, the trial evidence allowed a rational jury to find Mr. Cooper knowingly possessed the Card and knew of its fraudulent nature. The evidence also allowed the jury to find the Card satisfied the charged document element. Nor has Mr. Cooper shown a serious danger of a miscarriage of justice warranting a new trial.

### A. Mr. Cooper's false document constitutes an alien registration receipt card.

The United States sought to prove Mr. Cooper possessed a fraudulent immigration document. Congress through section 1546(a) criminalizes "knowingly possess[ing] . . . any such alien registration receipt card . . .  knowing it to be forged, counterfeited, altered, or falsely made . . ."[62] The United States needed to prove beyond a reasonable doubt Mr. Cooper (1) "knowingly possessed an [a]lien [r]egistration [r]eceipt [c]ard," (2) the card "was counterfeited or falsely made," and (3) he "knew the [card] was forged, counterfeited, altered or falsely made."[63]

Mr. Cooper argues the United States failed to prove the Card satisfied the charged document element because the Card bore the words "Permanent Resident Card," while Congress in section 1546(a) refers to an "alien registration receipt card" and the verdict sheet referred to an "alien registration card." We reject this argument. A permanent resident card is an alien registration receipt card as a matter of law. The Immigration and Naturalization Service revised the name of Form I-551 from "Alien Registration Receipt Card" to "Permanent Resident Card" in 1999.[64]

Congress in section 1546(a) does not require the United States to prove the document bore the exact words "alien registration receipt card." It criminalizes knowing possession of an "alien registration receipt card" or other qualifying immigration document "prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States."[65] The evidence further supported this conclusion. Experienced immigration and border-inspection witnesses used "permanent resident card," "green card," and "[alien registration]-number" terminology when referring to the same Card found in Mr. Cooper's wallet. The United States also used the terms "alien registration receipt card" and "alien registration card" when questioning the witnesses and the witnesses answered by discussing the same Card. This testimony readily allowed the jury to understand these terms referred to the same immigration document.

**B.**    **The United States adduced evidence of Mr. Cooper's knowledge.**

Mr. Cooper also argues we must set aside the verdict because the United States did not adduce sufficient evidence he knowingly possessed the Card and knew of its fraudulent nature on October 30, 2025. The United States cited several pieces of circumstantial evidence. We disagree with Mr. Cooper and defer to the jury's finding.

We instructed the jury "[a] person acts knowingly under the law if that person acts voluntarily and intentionally and not because of mistake or accident or other innocent reason" and "the United States must prove beyond a reasonable doubt Mr. Cooper was conscious and aware of the nature of his actions and of surrounding facts and circumstances."[66] The jury could infer knowledge from circumstantial evidence and further instructed it "may consider evidence about what [Mr. Cooper] said, what he did and failed to do, how he acted, and all the other facts and circumstances shown by the evidence which may prove what was in Mr. Cooper's mind at the time."[67]

The United States adduced evidence allowing the jury to find Mr. Cooper knowingly possessed the Card. Officer Williams swore Mr. Cooper said he received the Card in an envelope and Officer Charles-Pilgrim swore she found the Card in the sleeve part of Mr. Cooper's wallet with his other cards. The jury could infer Mr. Cooper removed the Card from the envelope and placed it in his wallet at some point from this testimony. The jury also heard evidence Mr. Cooper picked up his wallet and began looking through cards while Officer Charles-Pilgrim searched his backpack. It heard evidence Mr. Cooper told Officer Charles-Pilgrim the Card "wouldn't do anything for him" because it didn't have an address so he "just left [it] alone in his wallet." This testimony allowed the jury to find Mr. Cooper knew the Card remained in his wallet.

The United States also adduced evidence allowing he jury to find Mr. Cooper knew the

9

fraudulent nature of the Card. Mr. Cooper did not tell officers he applied for or received the Card through United States Citizenship and Immigration Services. Officer Charles-Pilgrim swore Mr. Cooper said he got the Card from someone in Missouri, "in a shop or a store," and paid for it. Officer Williams swore Mr. Cooper said he looked for an identification card while in Illinois or another continental state, went to a specific place to get one, and "spent a hundred dollars" to get the Card. Officer Williams also swore Mr. Cooper described going to a "shop or store," speaking with a "red skin guy," taking a photo, leaving, and later receiving an envelope containing the Card and Social Security card. This testimony allowed the jury to infer Mr. Cooper knew the Card came from a non-government source rather than a lawful immigration process.

The Supreme Court through Rule 29 does not ask whether we would have drawn the same inference had we sat as the factfinder. It requires us to view the evidence in the light most favorable to the verdict and ask only whether a rational jury could draw the inference from the evidence. The Supreme Court in Rule 29 does not permit us to reweigh the testimony. We may have found differently. But we defer to the jury and the United States adduced sufficient evidence to allow a rational jury to find Mr. Cooper knowingly possessed the Card and knew of its fraudulent nature on October 30, 2025.

Mr. Cooper also moves for a new trial under Rule 33 but develops no argument supporting this relief.[68] We deny the motion as unsupported. Rule 33 gives us broader discretion than Rule 29 but it does not permit us to grant a new trial simply because the evidence allowed competing inferences.[69] Mr. Cooper has not identified an erroneous jury instruction or other trial error creating a serious danger of a miscarriage of justice. Nor does our independent review reveal a basis to disturb the jury's verdict under Rule 33.

### III.     Conclusion

We must defer to the jury's verdict based on sufficient evidence Mr. Cooper knowingly possessed a fraudulent immigration document in his wallet properly searched in St. John on October 30, 2025 even though he properly entered St. John under permission granted to him through his British Virgin Islands' passport. The United States adduced sufficient evidence Mr. Cooper knowingly possessed this false document in his wallet even though he legally entered the United States. We must deny Mr. Cooper's motions consistent with Congress's mandate and the jury's findings as to Mr. Cooper's knowledge based on the adduced circumstantial evidence.

---

[1] Trial Tr. 191:24–192:5, 193:2–7, Feb. 23, 2026 (ECF 129).

[2] *Id*. 189:11–13, 192:14–193:1.

[3] *Id*. 193:8–20.

[4] *Id*. 193:21–194:23.

[5] *Id*. 194:24–195:9.

[6] *Id*. 195:10–196:7.

[7] *Id*. 196:8–17.

[8] *Id*. 196:18–197:4.

[9] *Id.* 197:5–9.

[10] *Id.* 197:19–25.

[11] *Id.* 198:1–6.

[12] *Id.* 197:10–14, 200:12–201:4, 204:3–21, 205:23–207:25, 209:1–19, 213:8–214:24; Trial Exs. 1, 12, 15, 16, 17.

[13] Trial Tr. 216:6–15, February 23, 2026 (ECF 129).

[14] *Id.* 229:13–24.

[15] *Id.* 216:16–20. The United States and witnesses used the terms "permanent resident card," "alien registration card," "alien registration receipt card," and "green card" interchangeably throughout

trial to describe the same document. For reasons explained during Mr. Cooper's oral Rule 29 motion at the close of the United States' case, and discussed in more detail below, we treat those terms as referring to the same document. Trial Tr. 78:17–80:5, Feb. 26, 2026 (ECF 130).

[16] Trial Tr. 216:21–217:5, 218:12–219:23, February 23, 2026 (ECF 129); Trial Ex. 2.

[17] Trial Tr. 217:6–13, February 23, 2026 (ECF 129).

[18] *Id*. 217:14–19.

[19] *Id.* 217:21–218:4, 221:15–222:19.

[20] *Id.* 222:20–223:10.

[21] *Id.* 223:20–224:23.

[22] *Id.* 225:2–19.

[23] *Id.* 225:20–226:3.

[24] *Id.* 227:7–228:7.

[25] *Id.* 228:14–21.

[26] *Id.* 228:22–229:6.

[27] *Id.* 233:19–235:20.

[28] *Id.* 235:21–237:5.

[29] *Id.* 237:6–238:6.

[30] *Id.* 238:7–22, 242:12–243:1; Trial Ex. 2.

[31] *Id.* 238:23–240:7. Officer Williams explained Custom and Border Protection system checks return information based on the data entered. A name-and-date-of-birth search returns information associated with the person searched, while an "[alien registration]-number" search returns information issued to the specific "[alien registration]-number" entered. *Id*. 245:15–21.

[32] *Id.* 240:13–18.

[33] *Id*. 241:1–9.

[34] *Id.* 241:10–16.

[35] *Id.* 262:13–264:4.

[36] *Id.* 264:1–13.

[37] *Id*. 264:23–265:6.

[38] *Id*. 267:1–268:6.

[39] *Id*. 268:7–18.

[40] *Id*. 248:5–25.

[41] *Id.* 249:10–250:8.

[42] *Id.* 250:9–251:5.

[43] *Id*. 251:6–252:20, 254:7–11.

[44] *Id*. 254:12–255:4.

[45] *Id*. 255:18–256:16, 260:13–261:4.

[46] *Id*. 261:5–9.

[47] Trial Tr. 5:11–6:4, Feb. 24, 2026 (ECF 130). We found Ms. Hoover qualified as an expert in forensic document examination based on her knowledge, skill, experience, training, and education. *Id*. 6:17–9:17.

[48] *Id*. 9:18–10:8.

[49] *Id*. 10:17–12:3, 40:25–41:11.

[50] ECFs 119, 120, 127. Federal Rule of Criminal Procedure 29 requires us to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a) (governing motions for acquittal made before submission to the jury). Federal Rule of Criminal Procedure 33 allows us to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

[51] Trial Tr. 58:11–59:19, Feb. 24, 2026 (ECF 130).

[52] *Id.* 59:20–62:9.

[53] ECFs 120, 127.

[54] *United States v. Dougherty*, No. 19-64, 2023 WL 2226780, at *5 (E.D. Pa. Feb. 24, 2023) (quoting *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009)), *aff'd sub nom., United States v. Henon*, No. 23-1463, 2024 WL 2746981 (3d Cir. May 29, 2024)).

[55] *Id.*

[56] *Id.*; *see also United States v. Pawlowski*, 27 F.4th 897, 902 (3d. Cir. 2022).

[57] *United States v. Zayas*, 32 F.4th 211, 216–17 (3d Cir. 2022) (alteration in original)

(quoting *United States v. Gambone*, 314 F.3d 163, 169–70 (3d Cir. 2003)).

[58] *United States v. Ortiz*, No. 22-381, 2025 WL 449534, at *2 (E.D. Pa. Feb. 10, 2025) (quoting *United States v. Brown*, No. 90-144, 1991 WL 7378, at *4 (E.D. Pa. Jan. 22, 1991)).

[59] *United States v. Silveus,* 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).

[60] *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)).

[61] *Id.*

[62] 18 U.S.C. § 1546(a).

[63] Trial Tr. 169:21–170:8, Feb. 24, 2026 (ECF 130); *see also United States v. Djurdjic*, No. 23-3890, 2025 WL 1467418, at *1 (9th Cir. May 22, 2025), *cert. denied,* 146 S. Ct. 341, 223 L. Ed. 2d 169 (2025) ("A person violates § 1546(a) if he: knowingly . . . possesses . . . any . . . document prescribed by statute or regulation for entry into . . . or as evidence of authorized stay or employment in the United States, knowing it to . . . have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained."); *United States v. Chinchilla*, 987 F.3d 1303, 1306 (11th Cir. 2021) (The defendant "'knowingly possess[ed], us[ed], and attempt[ed] to use a document prescribed by statute and regulation as evidence of authorized stay in the United States, that is, a[n] . . . Order of Supervision, knowing it to be forged, counterfeited, altered, and falsely made' in violation of § 1546(a)."); *United States v. Machorro-Xochicale*, 840 F.3d 545, 548 (8th Cir. 2016) ("[T]he government would need to 'prove beyond a reasonable doubt that (1) [the defendant] knowingly [possessed] documents prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, and (2) [the defendant] knew the documents had been forged, counterfeited, falsely made, or unlawfully obtained.'"); *United States v. Vyner*, 846 F.3d 1224, 1228 (D.C. Cir. 2017) ("The current version of Section 1546(a) requires, as relevant, the government to prove (1) the defendant knowingly possesses a document, (2) knowing it to be forged, counterfeited, altered, or falsely made, and (3) the document is prescribed by statute or regulation for entry into the United States.").

[64] *See* 63 Fed. Reg. 70313-01, 70313–16 (Dec. 21, 1998).

[65] Congress amended section 1546(a) after *United States v. Campos-Serrano*, 404 U.S. 293 (1971), to broaden the statute beyond documents "required for entry" to documents "prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States." *United States v. Ryan-Webster*, 353 F.3d 353, 362–63 (4th Cir. 2003). "In doing so, Congress expressed the clear intention of broadening the types of documents encompassed by § 1546(a)." *Id.* at 363 (citing H. Rep. No. 99–682(I), at 94 (1986) (explaining 1986 amendments expanded types of documents within § 1546(a)); S. Rep. No. 99–132, at 31 (1985) (same)).

We construe section 1546(a) to reach permanent resident cards even though the card bears the modern Form I-551 title rather than the former "alien registration receipt card" terminology.

[66] Trial Tr. 170:18–171:5, Feb. 24, 2026 (ECF 130).

---

[67] *United States v. Curran*, Nos. 23-2643, 23-2816, 2025 WL 1577564, at *2 (3d Cir. June 4, 2025); Trial Tr. 171:6–11, Feb. 24, 2026 (ECF 130).

[68] ECFs 120, 127.

[69] See *United States v. David*, 222 F. App'x 210, 215 (3d Cir. 2007) ("[O]ur review in the Rule 33 context is in some ways less constrained than under Rule 29.").